**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **KAREN L. BURKS,** *Plaintiff* | : | |
| **V.** | : | **C.A. NO.: 1:25-cv-00251-MSM-AEM** |
| **BROWN UNIVERSITY, alias,** *Defendant* | : | **Jury Trial Demanded** |

## FIRST AMENDED COMPLAINT

### I. Introduction

This action is brought by the Plaintiff, Karen L. Burks ("Plaintiff"), against her former employer, Defendant Brown University, alias ("Defendant") seeking compensatory, punitive, and liquidated damages, as well as attorneys' fees, litigation expenses, costs, and other equitable relief, arising out of Defendant's violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*., the Rhode Island Parental and Family Medical Leave Act ("RIPFMLA"), R.I. Gen. Laws § 28-48-1, *et seq*., the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq*., the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1, *et seq*., the Rhode Island Civil Rights of People with Disabilities Act ("CRPD"), R.I. Gen. Laws § 42-87-1 *et seq*., and the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1 *et seq*.

### II. Parties

1. Plaintiff is a resident of the Town of Somerset, County of Bristol, and Commonwealth of Massachusetts.

2. Defendant is a domestic non-profit corporation duly organized under the laws of the State of Rhode Island with a principal place of business located at 1 Prospect Street,

Providence, RI 02912.

## III. Jurisdiction

3. The United States District Court for the District of Rhode Island has federal subject matter jurisdiction over this case under 28 U.S.C. § 1331 insofar as Plaintiff asserts claims arising under federal law; specifically, the FMLA and ADA.

4. Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. § 1367 as they arise out of the same case or controversy.

## IV. Venue

5. Venue is proper in this Court insofar as Defendant is doing business in Rhode Island and therefore is deemed to reside in the District of Rhode Island and a substantial part of the acts and/or omissions giving rise to the claims asserted herein occurred in the District of Rhode Island, in compliance with the requirements set forth in 28 U.S.C. § 1391.

## V. Exhaustion of Administrative Remedies

6. On or about November 28, 2023, Plaintiff co-filed a Charge of Discrimination with the Rhode Island Commission for Human Rights ("RICHR") and the United States Equal Employment Opportunity Commission ("EEOC") against Defendant, alleging unlawful discrimination on the basis of her disability as well as unlawful retaliation for engaging in protected conduct in violation of the ADA, FEPA, and CRPD.

7. Thereafter, more than one hundred and twenty (120) days but not more than two (2) years having elapsed since the filing of Plaintiff's Charge of Discrimination, Plaintiff filed a Request for The Notice of Right to Sue with the RICHR and the EEOC.

8. Specifically, on or about April 21, 2025, Plaintiff requested a Notice of Right to Sue from the RICHR.

9. On or about April 25, 2025, the RICHR issued Plaintiff a Notice of Right to Sue.

10. On or about May 20, 2025, Plaintiff requested a Notice of Right to Sue from the EEOC, which the EEOC issued on the same date.

11. Accordingly, insofar as Plaintiff has satisfied all administrative and/or jurisdictional requirements prior to filing a lawsuit, Plaintiff has timely instituted suit in the within matter.

12. There is no requirement under the FMLA, RIPFMLA and/or the RICRA relative to the exhaustion of administrative remedies.

## VI. Material Facts

### *Factual Background*

13. Defendant hired Plaintiff on or about May 22, 1989, as a security officer.

14. On or about February of 1990, after Plaintiff completed the Rhode Island Municipal Police Academy, Defendant transitioned Plaintiff's employment to that of a Campus Police Officer.

15. Defendant employed Plaintiff as a Campus Police Officer for over thirty-three (33) years until Defendant terminated her employment on or about June 2, 2023.

16. Plaintiff's position as a Campus Police Officer fell within Defendant's Department of Public Safety ("DPS").

17. Plaintiff regularly worked forty (40) hours per week.

18. During some weeks, Plaintiff also worked overtime.

19. Defendant afforded Plaintiff a benefits package that included, but was not limited to, medical benefits, long-term disability, life insurance, retirement, and paid time off.

20. As a Campus Police Officer, Plaintiff's job duties included, but were not limited to, protecting Defendant's community, enforcing Defendant's rules and regulations, and ensuring the safety and security of all of Defendant's properties as well as all its faculty, staff, student body, guests and visitors.

21. At all relevant times, Plaintiff was a productive and high-performing employee with work performance reviews that met or exceeded Defendant's expectations and without any history of purported work performance deficiencies.

22. Throughout her career as a Campus Police Officer, Plaintiff was fully dedicated to her job and was well-respected.

23. Plaintiff consistently and regularly went above and beyond what was asked of her.

24. Plaintiff always provided assistance and helped where she could, whether it was by agreeing to work overtime, arranging for someone else to work so that sufficient officers were present and on duty, and/or by assisting with matters or projects.

***Approved Accommodation***

25. As set forth below, at all relevant times, Plaintiff suffered from a mental impairment that qualifies as a disability under applicable law.

26. Moreover, at all relevant times, Defendant, by and through its agents, was aware that Plaintiff suffered from this impairment.

27. Specifically, Plaintiff was diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD") in 2010.

28. Plaintiff was re-evaluated for ADHD on or about 2014 or 2015, at which time it was confirmed that she continued to suffer from ADHD.

29. Plaintiff began taking prescription medication for her ADHD on or about sometime in 2016.

30. Throughout Plaintiff's employment with Defendant, Plaintiff had ADHD.

31. During the course of her employment with Defendant, Plaintiff's ADHD caused her to be a few minutes tardy for her scheduled shift.

32. Specifically, Plaintiff's ADHD caused her to lose track of time and also caused her to believe that she could accomplish tasks much quicker than the amount of time actually required to perform the tasks.

33. Plaintiff's ADHD made it difficult for Plaintiff to properly allocate and devote her time and attention to the various obligations and issues that she had going on in her life at that moment, including, but not limited to, her parents' ailing health, her responsibilities as president of a union, her work-related duties and responsibilities, etc.

34. Notwithstanding her ADHD, Plaintiff always called DPS ahead of her shift to let them know if she was running a few minutes late.

35. In January 2020, Plaintiff's medical provider, Dr. Paul B. Lieberman, submitted a medical certification for Plaintiff to receive intermittent FMLA leave for her ADHD, specifically for the brief tardiness it caused.

36. The certification stated, "Patient has attention deficit-hyperactivity disorder (ADHD). At times, this condition can interfere with planning and maintaining daily structure. At times of increased stress, patient may require additional time to complete … tasks."

37. The certification also explained that Plaintiff was receiving ongoing weekly psychotherapy, which treatment was "aimed at improving the problem," but the condition was active and ongoing.

38. Dr. Lieberman certified that her condition may require some accommodation "concerning time" during exacerbations and requested that she receive intermittent leave three (3) to four (4) times per month.

39. At that time, Defendant allowed Plaintiff to call DPS on her drive into work to let DPS know when she was running late, and after Plaintiff arrived at work, she could request to use her FMLA time for her tardiness.

40. At no point in time while this protocol was in place did Defendant mandate a minimum amount of advance notice that Plaintiff needed to provide Defendant in order to use her intermittent FMLA time before her scheduled shift.

41. During this time, Defendant also had a policy not to consider any arrival up to seven (7) minutes late to be a "dockable" tardy, meaning employees would not be disciplined for that time.

42. After Plaintiff was first approved for intermittent FMLA leave, the COVID pandemic changed DPS's workplace practices and, for some time, officers were not required to swipe-in at all; during that time Plaintiff's tardiness was not raised as an issue and Plaintiff was not provided any specific instructions on how to utilize her approved intermittent FMLA leave.

43. On or about January 1, 2022, Plaintiff became the Union President for the Brown University Security Patrolperson's Association ("BUSPA").

44. During Plaintiff's employment with Defendant, BUSPA was a member of and represented by The American Coalition of Public Safety ("ACOPS").

***First Discriminatory and Retaliatory Act—PIP Imposed***

45. On or about January 31, 2022, just one month after Plaintiff assumed the duties of union President, DPS instructed Plaintiff to report to a meeting with DPS Captain James Jackson and DPS Lieutenant John Carvalho.

46. During this meeting, Plaintiff was advised that she was being placed on a 60-day Performance Improvement Plan ("PIP"), due to tardiness.

47. The PIP made no reference to Plaintiff's approved intermittent FMLA leave and accommodation for her known disability and instead threatened Plaintiff if she did not come into complete compliance with the "expectations of [Plaintiff's] position."

48. However, as stated above, Plaintiff had always called DPS ahead of her shift to

inform DPS if she was going to be tardy and Plaintiff was nearly always tardy because of her disability, of which her supervisors were aware.

49. In January 2022, Plaintiff was late a total of six (6) times, four (4) of which were seven (7) minutes or less; the remaining instances of between eight (8) and twelve (12) minutes late were well within the certified intermittent FMLA leave that she could use three (3) to four (4) times per month.

50. Plaintiff was later informed by Lieutenant Carvalho that her being placed on a PIP was initiated and instigated by Suzanne Flynn ("Ms. Flynn"), DPS's Director of Finance and Administration, who was aware of Plaintiff's disability.

51. Despite being in charge of Defendant's DPS Human Resources activities, Ms. Flynn never communicated with Plaintiff during or regarding her being placed on a PIP.

52. Indeed, she did not communicate with Plaintiff about the PIP until Plaintiff's May 2022 suspension discussed below.

53. In response to the PIP, Plaintiff immediately actively sought additional resources and protections related to her ADHD disability that caused her to be tardy, including reaching out to Defendant's Employee Assistance Program ("EAP") and Broadspire, Defendant's third-party medical leave administrator.

54. On February 28, 2022, Dr. Lieberman submitted an application for ADA accommodation, explaining the following about her ADHD:

> At times of increased stress - whether at work, or at home - symptoms of ADHD worsen. At such times, Ms. Burks has significantly more difficulty focusing and managing tasks which require planning, prioritizing and handling emotional stress (i.e., executive functioning).
> …
> When Ms. Burks experiences worsening impairment in executive functioning [sic], she has difficulty staying organized especially with regard to timeliness. This is manifested as procrastination, difficulty focusing and, in particular, meeting certain time

> requirements (i.e., arriving on time; she regularly (over)compensates by staying late).
> …
> My impression is that the employee is an excellent officer, often going 'above and beyond' and earning appreciation from people she helps and from colleagues. Timeliness is the only area that has ever, to my knowledge, been identified as problematic, so accommodation in her ability to arrive on time will help her continue to perform her job in the otherwise exemplary way she does. This will also benefit the Department because of her many years of experience, and her characteristically working extra (and often under-subscribed to) shifts. The duration of this accommodation is difficult to specify, because it occurs intermittently, depending upon level of stress; it is being addressed in psychotherapy weekly.

55. In describing the specific accommodation needed and how it would help her perform her essential job functions, Dr. Lieberman wrote the following:

> Lateness, often only to a minor degree, is only area of identified impairment. Accommodating this is clearly best for the employee and her employer. She is taking medication to address ADHD and receives benefit from this medication. She is also in weekly psychotherapy which addresses her ability to handle stress more effectively and with less harmful effect on her own level of functioning (e.g., overworking to the point of fatigue by covering shifts at work and helping with a difficult family situation at home where she is primary homemaker).
> …
> A leave of absence is not recommended and would not address the intermittent, stress-related nature of the employee's impairment. Rather, this impairment can be expected to vary with intercurrent stress. From her history over the past several years, it is very rare for her to be more than 8 minutes late (the cutoff) more than twice per month, although lateness of two to four minutes is still common.

56. During that same time, Plaintiff repeatedly asked for clarity on how exactly she was required to utilize her intermittent FMLA, because she was getting conflicting information, but she never received the clarity she sought.

57. Plaintiff was told that Broadspire was "taking a back seat" on evaluating her FMLA and ADA accommodation requests and that Defendant's Leave and Accommodation

Manager, Samantha St. Onge ("Ms. St. Onge"), was reaching out to Ms. Flynn about her requests.

58. Internal communications between Defendant and Broadspire indicate that Plaintiff's accommodation request was treated as identical to her intermittent FMLA leave and was ultimately closed on May 19, 2022, with Defendant appearing to treat the request as an intermittent FMLA leave rather than as an ADA accommodation.

59. Plaintiff's PIP expired on March 31, 2022.

60. During the PIP period, Plaintiff was more than seven (7) minutes late two (2) times in February, and one (1) time in March.

61. On April 12, 2022, DPS's Vice President for Campus Safety, Rodney Chatman ("Vice President Chatman"), emailed Maria Chester ("Ms. Chester"), Assistant Director of Employee and Labor Relations, to ask about the status of Plaintiff's accommodations.

62. Ms. Chester responded by informing Vice President Chatman that "[t]he intermittent FMLA is approved through June 30, 2022, with medical certification supporting 2 instances monthly, of up to 1/2 hour - 1 hour, for each instance."[1]

63. Inexplicably, Vice President Chatman then immediately responded that he wanted to move forward with a suspension and extension of Plaintiff's PIP.

64. On April 13, 2022, Defendant's Leave and Accommodation Manager, Samantha St. Onge ("Ms. St. Onge"), sent an email to many of Plaintiff's supervisors, and Rhonda Hospedales ("Ms. Hospedales"), Defendant's Senior Director of Employee and Labor Relations, to explain that Plaintiff had concurrent intermittent FMLA leave requests and ADA

[1] It is unclear why Ms. Chester stated that Plaintiff was only certified for 1-2 instances per month when Dr. Lieberman's FMLA certification expressly requested 3-4 times per month, and his ADA Accommodation certification explained, "From her history over the past several years, it is very rare for her to be more than 8 minutes late (the cutoff) more than twice per month, although lateness of two to four minutes is still common."

accommodation requests that together allowed Plaintiff to be protected for incidents of tardiness two (2) times per month for half an hour to an hour for each episode.

***Second Discriminatory and Retaliatory Act—First Suspension Imposed***

65. On or about May 2, 2022, DPS instructed Plaintiff to report to a meeting.

66. During this meeting, DPS informed Plaintiff that she was being suspended the next two (2) days, May 3, 2022, and May 4, 2022, without pay, and that her PIP was being extended for another thirty (30) days.

67. Per DPS, Plaintiff was being suspended allegedly because, since January 31, 2022, Plaintiff was purportedly late to work on ten (10) occasions.

68. However, once again, Plaintiff had always called DPS prior to her shift to inform DPS if she was going to be late, even when she thought she *might* be late, and all of her instances of being late were caused by her disability.

69. Furthermore, Plaintiff's tardiness was particularly *de minimis* as it ranged from only one (1) minute to a maximum of ten (10) minutes on each of these occasions, so it never interfered with the ability of DPS and/or Plaintiff to perform its public safety functions for Defendant.

70. Indeed, Plaintiff was more than seven (7) minutes late only two (2) times in April 2022 (for a total of five (5) instances in the three months since her PIP was initiated).

71. Therefore, Defendant's discipline for ongoing tardiness was contrary to its own practice of not disciplining officers for being seven (7) or fewer minutes late.

72. During this meeting, Plaintiff complained that the suspension being imposed on her violated the contract (the "Contract") between DPS and BUSPA because the Contract stated that only DPS's Colonel held the authority to impose such serious disciplinary action and the Colonel never authorized Plaintiff's suspension or spoke to Plaintiff about it.

73. More importantly, Plaintiff expressly brought up her FMLA leave and again received conflicting information from Ms. Flynn about how she was supposed to use it.

74. Ms. Flynn told Plaintiff that sick leave and FMLA leave were different and that she no longer needed to use sick leave for days that she was covered by her intermittent FMLA leave.

75. Ms. Flynn also told Plaintiff that to use her FMLA leave, she needed to call the Supervisor while she was on her way to work, and then when she clocked in, she would let the supervisor know that time and whether it was covered by FMLA.

76. Plaintiff was expressly told that the supervisor would document her use of FMLA leave, and she was not told that she needed to send anything in writing to document using FMLA leave.

77. Plaintiff told Ms. Flynn that she had an appointment with her medical provider later that day to get a recertification for her FMLA leave.

78. Defendant proceeded with Plaintiff's unpaid suspension despite Plaintiff's complaints.

79. Plaintiff served the two-day unpaid suspension.

***Third Discriminatory and Retaliatory Act—Unilateral Change to FMLA/ADA Accommodation for Disability***

80. On May 2, 2022, the same day she was notified of her suspension, Plaintiff had an appointment with Dr. Lieberman, who then submitted yet another certification for intermittent FMLA leave, this time stating that the frequency of her flare-ups, and thus requested intermittent leave, was zero (0) to (5) times per week for one (1) to twenty (20) minutes.

81. On or about May 16, 2022, Defendant's Leave and Accommodation Manager, Samantha St. Onge ("Ms. St. Onge"), sent Plaintiff an email confirming that she was permitted to take intermittent FMLA leave in the frequency and duration that Plaintiff's doctor had

certified on or about May 2, 2022, which was zero (0) to five (5) times per week at one (1) to twenty (20) minutes per episode.

82. Nowhere in Ms. St. Onge's email did she provide for a minimum amount of advance notice that Plaintiff needed to provide Defendant or DPS when requesting use of Plaintiff's FMLA time before her scheduled shift, nor was Plaintiff told that she needed to submit her FMLA leave requests in writing.

83. Throughout this process, Plaintiff was repeatedly told that her department would be responsible for tracking her FMLA use as long as she informed her supervisor when she intended to use the leave.

***Fourth Discriminatory and Retaliatory Act and Interference with FMLA Rights – Denial of Grievance***

84. On May 13, 2025, Plaintiff filed a Step 3 Grievance to contest the two-day suspension imposed on her for her tardiness.

85. In the Grievance, Plaintiff explained the above process of being placed on a PIP, delayed responses to her FMLA/ADA Certifications, conflicting responses on using FMLA leave, and subsequent discipline in violation of her statutory and contract rights.

86. On July 18, 2022, Ms. Hospedales issued a decision on behalf of Defendant denying Plaintiff's Grievance, including the following response to Plaintiff's assertion of her FMLA/ADA rights:

> While Officer Burks has submitted a number of documentation showing her efforts to pursue resources and benefits through the Human Resources benefits office, namely pursuit of an approved accommodation and/or intermittent FMLA leave, these efforts are simply not enough to overturn the suspension, given that Officer Burks continued to be late on several occasions during the term of the initial PIP which ended on March 31, 2022. Furthermore, throughout most of the PIP, Officer Burks had in fact a documented intermittent FMLA in place, and most of her efforts to secure the accommodation took place well into the period of time that the PIP had already commenced. Finally, it must be clear that

> her decision to pursue or access these resources should in no way have been interpreted by Officer Burks as providing her with some type of exculpatory basis for her need to improve her time and attendance issues, notwithstanding the fact that the department did respectfully delay formal decisions on the PIP and suspension for a reasonable time awaiting an outcome on her efforts.

87. Thus, Plaintiff was told in a formal decision on her Grievance that her approved intermittent FMLA leave could not be used to justify any instances of being tardy and her belief that it could was wrong.

88. In the meantime, Plaintiff's extended PIP concluded on or about June 7, 2022.

89. On June 17, 2022, Plaintiff was notified that her PIP was concluded because she had been tardy only two times, and both times were covered by her intermittent FMLA leave.

90. From May 1, 2022, to June 7, 2022, the extended PIP period, Plaintiff was late between one (1) minute and ten (10) minutes fifteen (15) times; only two (2) of those occasions were for more than seven (7) minutes.

***Fifth Discriminatory and Retaliatory Act—Second Suspension Imposed***

91. On or about November 21, 2022, near the end of a Contract negotiation meeting with Defendant, DPS Deputy Chief of Police John Vinson ("Deputy Chief Vinson") requested if he could see Plaintiff and BUSPA's attorney for a few minutes after the meeting, to which they agreed.

92. Plaintiff and BUSPA's attorney went into another room and were met by Deputy Chief Vinson and Ms. Flynn.

93. Deputy Chief Vinson proceeded to accuse Plaintiff of being late to work fourteen (14) times and that he was considering suspending Plaintiff for thirty (30) days.

94. Ms. Flynn then read aloud the fourteen (14) dates that she and Deputy Chief Vinson claimed Plaintiff was late to work.

95. Plaintiff responded by reminding Deputy Chief Vinson and Ms. Flynn of the arrangement she had with Defendant regarding her use of intermittent FMLA, which Defendant had approved.

96. Specifically, Plaintiff shared that under this arrangement, Plaintiff would call the supervisor, notify them of the time of her call, state whether Plaintiff would be using her FMLA time for that particular day, and Defendant and/or DPS would document her use of FMLA time.

97. Deputy Chief Vinson seemed to be unaware of this arrangement and responded by asking what would happen if DPS got busy and forgot to document Plaintiff's use of FMLA time, to which Plaintiff responded by stating that she did not know as that was out of her control.

98. Plaintiff also stated that she had taken the additional step of sending emails memorializing her request for use of FMLA time when the supervisor requested her to do so, but she was never required to do so.

99. Plaintiff also stated that, in the future, she would send an email whenever she used her FMLA time.

100. Following the meeting, Ms. Flynn sent Plaintiff an email recapping the meeting.

101. In her email, Ms. Flynn stated that DPS required Plaintiff to call the Sergeant as soon as possible in advance of Plaintiff's shift notifying the Sergeant that Plaintiff would be arriving late and that she would be using her FMLA time.

102. At no point during the meeting nor in Ms. Flynn's email did DPS require Plaintiff to provide DPS with a minimum amount of advanced notice prior to Plaintiff's shift letting DPS know that she would be using her intermittent FMLA leave.

103. On or about November 21, 2022, Ms. Flynn sent Plaintiff an email with the fourteen (14) dates DPS claimed Plaintiff reported late to work.

104. The email was blatantly false.

105. Of the 14 dates provided, one (1) day Plaintiff was off-duty (meaning out of work); two (2) days DPS had documentation that Plaintiff used her FMLA time; two (2) days Plaintiff had used her sick time for the amount of time for which she was tardy; one (1) day there was an auto accident with traffic backed up into Massachusetts that caused Plaintiff to be late; and at least four (4) of the other days Plaintiff had used her FMLA time as evidenced by Plaintiff's own personal calendar on which she had recorded that she used FMLA time on those dates.

106. On November 28, 2022, Plaintiff sent an email to Ms. Flynn detailing all the above errors in their list of dates, and additionally explaining, "I have notes for some of the dates noted in my calendar but not for others. This does not mean that I did not request Intermittent FMLA time, it just means I may not have noted it. When I've told a Sergeant that I was using FMLA time, I've had no idea where or if they noted it. I do not know what the Sergeant's procedure is, nor where the Sergeant documents this type of request."

107. Therefore, she explicitly objected to an additional four (4) dates for which she believed she informed the supervisor that she was using FMLA leave.

108. Plaintiff also reiterated the lack of clarity in when and how she was required to use her FMLA leave, explaining that, "During our conversation, I indicated that it was not clear to me if I was being required to use FMLA time for a minute or two, vs 5 minutes or more, like when I had to send something to the supervisor when the PIP was in place. During the PIP, I would send something to the supervisor if I was five minutes, or more, late. You indicated that I needed to use FMLA related time, if applicable, for any time after my scheduled reporting time. … I would like to request that the expectations for the use of my FMLA time please be put in writing. This way there are no discrepancies or misunderstandings."

109. Two (2) additional dates, of the fourteen (14) dates she was accused of being late,

were for seven (7) minutes or less, and had thus never previously been considered tardies (eight (8) total dates of those identified were for being late seven (7) minutes or less).

110. In response to Plaintiff's email, Ms. Flynn expressly acknowledged the policy on allowing a five (5) minute[2] grace period and stated that it was discontinued on October 1, 2022.

111. On or about Saturday, December 3, 2022, Plaintiff met with Deputy Chief Vinson and Ms. Flynn.

112. During this meeting, Plaintiff was handed a letter stating that she was being suspended for thirty (30) working days due to DPS's list of the above-described 14 days for which DPS falsely accused Plaintiff of being late to work.

113. Then, after a discussion about the holidays and manning levels, Deputy Chief Vinson and Ms. Flynn left the room.

114. When they returned, they reduced the suspension to seven (7) days with two (2) to serve on the condition that Plaintiff would agree not to grieve the suspension.

115. Plaintiff chose to accept this offer and agreed not to file a grievance.

116. On Monday, December 5, 2022, Plaintiff received the updated suspension letter via email from Stacey Adams ("Ms. Adams"), DPS's Executive Assistant to the Vice President for Campus Safety.

117. In her reply to the email, Plaintiff acknowledged receipt of the letter, advised Ms. Adams that she would not be reporting to work again until Friday, December 9, 2022, and further advised that both Deputy Chief Vinson and Ms. Flynn were aware of this.

118. When Plaintiff reviewed the letter, Plaintiff observed that the only dates DPS removed from the list of dates it claimed Plaintiff was tardy were two (2) days DPS determined were days on which Plaintiff used FMLA time and one (1) day when Plaintiff was off-duty.

---

[2] Although both Plaintiff and Ms. Flynn referred to the "five minute" policy, the practice of withholding discipline had applied to anyone who swiped in seven (7) minutes or less.

119. DPS failed to remove the several other dates where Plaintiff's tardiness was justified either because of the proper use of intermittent FMLA time, sick time, or otherwise.

120. On Friday, December 9, 2022, Plaintiff spoke with Ms. Adams, and Plaintiff stated that she did not know if she needed to sign the suspension letter.

121. Plaintiff asked to speak with DPS's Vice President for Campus Safety, Rodney Chatman ("Vice President Chatman"), to contest the suspension letter and to explain to him that the suspension letter still unjustifiably included dates on which DPS claimed Plaintiff had been tardy, but in actuality was not.

122. Ms. Adams arranged for a phone call with Vice President Chatman on that same Friday afternoon, during which Plaintiff explained to him the inaccuracy of the letter as previously alleged above.

123. Vice President Chatman suggested that Plaintiff send an email to him, Deputy Chief Vinson, and Ms. Flynn describing the inaccuracy of the claimed late days.

124. During that call, Vice President Chatman did not instruct Plaintiff to sign the suspension letter.

125. The next morning, Saturday, December 10, 2022, at or around 7:00 am, BUSPA Treasurer Thomas Tougas called Plaintiff and advised her that Deputy Chief Vinson contacted him and said that if Plaintiff had not yet signed the suspension letter, then Plaintiff's suspension would revert back to the originally imposed 30-day length of time.

126. Plaintiff proceeded to draft and send the email to Ms. Flynn and Deputy Chief Vinson that Vice President Chatman had recommended Plaintiff send.

127. Plaintiff also sent the email to Vice President Chatman.

128. Despite the fact that no one had ever instructed Plaintiff to sign the suspension letter, Ms. Flynn quickly responded to Plaintiff's email by stating that because Plaintiff had not

yet signed the suspension letter, Plaintiff's suspension would be reverting back to 30 working days.

129. Ms. Flynn also stated in her email that Plaintiff was prohibited from contesting the suspension.

130. On Monday, December 12, 2022, Deputy Chief Vinson handed Plaintiff a letter suspending her beginning December 15, 2022, with a return-to-work date of January 27, 2023, listing eleven (11) occasions of being late in the previous two months, seven (7) of which Plaintiff had asserted were covered by FMLA, and one (1) was covered by sick leave.

131. Plaintiff again attempted to explain to Deputy Chief Vinson that DPS's accusations against her were false, but he refused to change his mind.

132. On December 19, 2022, Plaintiff filed a Step 3 Grievance over her 30-day suspension, recounting the numerous errors in the suspension notice, interference with her FMLA rights, and the numerous violations of the union contract that occurred during the process of issuing the 30-day suspension.

133. On January 5, 2023, Ms. Hospedales again issued a decision on behalf of Defendant largely upholding Plaintiff's suspension.

134. In her decision, Ms. Hospedales did not address any of Plaintiff's complaints about being disciplined for days when she had used her intermittent FMLA leave, and instead wrote that it was "frustrating" "that the Department gave Officer Burks a limited opportunity to reduce the suspension to seven days under specific conditions but … she decided to focus her efforts on disputing several of the recorded instances of tardiness (despite the fact that eliminating these instances would not have eliminated the justification for the issuance of a discipline)."

135. Thus, by asserting her right not to be disciplined for use of FMLA Leave, Plaintiff was further penalized.

136. As a result of the Grievance filed by Plaintiff, Plaintiff's suspension was reduced to twenty (20) working days, resulting in her returning to work on January 13, 2023.

137. As a result of this suspension:

a) Plaintiff lost twenty (20) days of pay, one day being a holiday on which Plaintiff would have earned double her normal pay; and,

b) Plaintiff lost out on two (2) holiday paid-time off days (8 hours each) and ten (10) winter recess paid-time off days (8 hours each) that Plaintiff would have accrued and enjoyed had she worked during this time period.

138. In addition, DPS failed to comply with its obligations under the Contract in issuing Plaintiff this suspension, including, but not limited to, providing Plaintiff with a copy of the written charge and reports and statements pertaining to the investigation relating to Plaintiff's suspension.

***Sixth Discriminatory and Retaliatory Act—Unilateral and Arbitrary Change in Accommodation***

139. On or about March 28, 2023, Plaintiff was told to report to a meeting with Ms. Flynn and Deputy Chief Vinson and was advised to bring Union representation with her.

140. BUSPA Vice President Louise McLaughlin accompanied Plaintiff to the meeting.

141. During this meeting, Ms. Flynn stated that effective immediately Plaintiff was required to call in thirty (30) minutes prior to her shift if she wanted to use her FMLA time.

142. Ms. Flynn also stated that Plaintiff needed to make the call prior to leaving her house, instead of enroute.

143. Ms. Flynn also falsely claimed that Plaintiff had been informed in December 2022 that she was required to call into work 30 minutes prior to her shift if she was going to be late.

144. Ms. Flynn also claimed that FMLA and sick time were one in the same, but that is not true under the Contract (and was the opposite of what Ms. Flynn had stated in their meeting on May 2, 2022).

145. Later that day on March 28, 2023, Ms. Flynn sent Plaintiff an email memorializing the meeting.

146. In her email, Ms. Flynn reiterated that in order for Plaintiff to use her intermittent FMLA, Plaintiff was required to call the Sergeant on duty no less than thirty (30) minutes before the start of her scheduled shift to notify DPS she was going to be late and that she would be using her intermittent FMLA time.

147. Requiring Plaintiff to call no less than thirty (30) minutes before the start of her scheduled shift was not realistic and rarely possible because she did not need to leave her house until after that in order to get to work on time.

148. Therefore, Plaintiff would not always know if she was going to be late thirty (30) minutes before her shift, particularly considering that she was being disciplined for being late if she arrived as little as one (1) minute late.

***Seventh Discriminatory and Retaliatory Act—Termination***

149. On or about May 15, 2023, Plaintiff called DPS's Detective Sergeant David Allsworth ("Sergeant Allsworth") at 6:44 a.m. and told him that she was running a few minutes late, that she had been out of her ADHD medication because the pharmacy and the warehouse were out of stock, and that Plaintiff would be using her FMLA time for that day.

150. Plaintiff clocked into work at 7:02:45 a.m. that day for a 7 a.m. shift.

151. Because Plaintiff was only two (2) minutes late, it would have been impossible for her to notify her supervisor at 6:30 a.m. that she was going to be late, because that is before the time she needed to leave her house to be on time.

152. On or about May 17, 2023, Plaintiff sent an email to Sergeant Allsworth, DPS Lieutenant Elayna Boucher, and DPS Financial Operations Manager Jillian Rourke ("Ms. Rourke") requesting that she be permitted to use three (3) minutes of FMLA time for May 15, 2023.

153. Shortly after Plaintiff sent this email, Sergeant Allsworth sent an email to Plaintiff, Lieutenant Boucher, and Ms. Rourke confirming that Plaintiff did in fact call him on May 15, 2023, and requested to use FMLA time for that day.

154. On or about May 25, 2023, which was Plaintiff's scheduled day off from work, Plaintiff received a phone call from Ms. Flynn who informed Plaintiff that DPS scheduled a meeting with Plaintiff for May 31, 2023, and she advised Plaintiff to bring Union Representation.

155. May 31, 2023, was Plaintiff's scheduled day off from work and both DPS and Ms. Flynn knew that it was Plaintiff's day off from work.

156. BUSPA Treasurer Tougas and BUSPA Secretary Jaclyn Banville accompanied Plaintiff to the meeting. Ms. Flynn and Vice President Chatman were also in attendance.

157. During the May 31, 2023, meeting, Ms. Flynn provided Plaintiff with a letter written by Deputy Chief Vinson and Ms. Flynn notifying Plaintiff of DPS's intent to terminate Plaintiff's employment purportedly because after Plaintiff's suspension in December 2022, Plaintiff arrived late to work on April 27, May 15, and May 23.

158. However, on those three (3) dates, Plaintiff's being a few minutes tardy was outside of her control and as discussed above, Plaintiff expressly requested to use her FMLA time for May 15. Specifically:

a) On April 27, 2023, there was an auto accident on Route 195 West near East Providence so Plaintiff called Sargeant Allsworth at 6:51 a.m. and let

him know that Plaintiff would be a few minutes late to work. Plaintiff's shift started at 7:00 a.m. and Plaintiff clocked in that day at 7:06:25 a.m. Plaintiff also sent an email to Sergeant Allsworth, Lieutenant Boucher, and Ms. Rourke that same day at 12:43 p.m. memorializing what had transpired that morning. In her email, Plaintiff specifically mentioned that the Rhode Island Department of Transportation digital traffic report signs displayed notices that there was an accident.

b) On May 15, 2023, as previously detailed above, Plaintiff had notified Sergeant Allsworth that she would be a few minutes tardy and sent a follow-up email to DPS staff requesting use of intermittent FMLA time for those few minutes.

c) On May 23, 2023, Plaintiff called DPS Lieutenant Robert Mackisey ("Lieutenant Mackisey") at 6:31 a.m. telling him that Plaintiff found glass all over her driveway and out onto the street from what appeared to be from a thick glass bottle. Plaintiff shared with Lieutenant Mackisey that she was just going to sweep the glass so that she wouldn't get a flat tire. Plaintiff headed to work and on the Route 195 West Broadway exit where she became stuck in traffic. Plaintiff called DPS again and spoke with Sergeant Allsworth at 6:53 a.m. and told him about the accident that caused her to be a few minutes late. In fact, during roll call that morning, Sergeant Allsworth said DPS Officer Balsco disclosed he had witnessed the accident. Plaintiff clocked in that day at 7:03:33 a.m. for a 7:00 a.m. shift. Shortly after her arrival, Plaintiff sent an email to Sergeant

Allsworth, Lieutenant Mackisey, Lieutenant Boucher, and Ms. Rourke recounting the above.

159. This notice letter also expressly based the decision on Plaintiff's prior discipline, including the PIP in January 2022, 2-day suspension in May 2022, and 30-day suspension in December 2022.

160. The letter also acknowledged that Plaintiff requested use of her intermittent FMLA leave but stated that she "did not follow the process required to use FMLA."

161. During the May 31, 2023, meeting, Plaintiff voiced her objection to the proposed termination letter and explained that her being a few minutes tardy on April 27, 2023, and May 23, 2023, was out of her control as described above.

162. Plaintiff stated further that she notified her supervisors as soon as possible and documented the times and reason for her tardiness in emails.

163. She also recounted what had happened on May 15, 2023, when she had run out of her ADHD medication, requested to use her FMLA time, and emphasized that she had been honest with DPS about the time she had called Sergeant Allsworth.

164. Plaintiff also stressed that she had always called her supervisors even if she thought she *might* be late and that she had always clocked in, no matter what time she arrived to work, unlike other officers who chose not to clock in at all when they were late and conveniently claimed that they "forgot" to clock in.

165. Plaintiff also raised the fact that prior to the May 31, 2023, meeting, DPS had never notified Plaintiff that any of these three (3) instances were an issue.

166. During the meeting, Secretary Banville stated that by DPS changing the call-in time and procedure to use FMLA and sick time, DPS was setting Plaintiff up to fail.

167. Secretary Banville further stated that DPS knew full well that Plaintiff struggled with getting out of the house on time because of her ADHD and yet DPS added another requirement for Plaintiff to comply with before she left her house by mandating that she call in 30 minutes prior to her shift.

168. At the conclusion of the meeting, Plaintiff was advised that effective immediately she was placed on administrative leave.

169. Plaintiff was further instructed to return on Friday, June 2, 2023, at 8:30 a.m. for Vice President Chatman's final decision.

170. On Friday, June 2, 2023, Plaintiff met with Vice President Chatman and Ms. Flynn. Plaintiff was accompanied by BUSPA Treasurer Tougas and BUSPA Secretary Banville.

171. Vice President Chatman passed a termination letter across the table to Plaintiff and informed Plaintiff that he was following the recommendation to terminate Plaintiff's employment and that Plaintiff's employment was terminated effective immediately.

172. At 8:34 a.m. that day, Ms. Flynn sent an email to all of DPS stating that effective Friday, June 2, 2023, Plaintiff was no longer employed by DPS.

173. Ms. Flynn sent this email while Plaintiff was still meeting with Vice President Chatman and Ms. Flynn.

174. Once again, DPS failed to meet its obligations under the Contract in terminating Plaintiff, including, but not limited to, providing Plaintiff with copies of the written charge and reports and statements pertaining to any investigation.

**VII. <u>Interference and Retaliation in Violation of the FMLA and RIPFMLA</u>**

175. Defendant's discipline and termination of Plaintiff's employment because of her documented request to use her FMLA/RIPFMLA intermittent leave gives rise to a *prima facie*

case of unlawful interference and discrimination against Plaintiff for exercising and/or seeking to benefit from her rights under the FMLA and RIPFMLA.

176. Defendant's repeated shifting of requirements and lack of clarity for asserting and utilizing her FMLA/RIPFMLA give rise to a *prima facie* case of unlawful interference with Plaintiff's protected rights under the FMLA and RIPFMLA.

177. Whether or not Defendant *intended* to deprive Plaintiff of her rights under the FMLA and RIPFMLA is irrelevant; the only question is whether Plaintiff was denied her protected rights under the FMLA and RIPFMLA, which she undisputedly was.

178. Additionally and/or in the alternative, Defendant terminated Plaintiff's employment because Plaintiff took and/or requested to take FMLA/RIPFMLA intermittent leave and/or complained about violations of her FMLA/RIPFMLA rights, which gives rise to a *prima facie* case of unlawful retaliation against Plaintiff for exercising her rights under the FMLA and RIPFMLA.

## VIII. Disability Discrimination in Violation of the ADA, CRPD, FEPA, and RICRA

### *Protected Impairment*

179. At all relevant times, Plaintiff suffered from a disability, specifically ADHD, as that term is defined and applied under the ADA, FEPA, CRPD, and/or RICRA.

180. Defendant was aware of Plaintiff's disability at all relevant times.

181. At all relevant times, Plaintiff's disability substantially limited one or more major life activities, including concentrating, working, and brain function, among others.

182. At all relevant times, Defendant had a record of Plaintiff's impairment, as that term is defined and applied under the ADA, FEPA, CRPD, and/or RICRA, including Plaintiff's ADHD.

183. In addition and/or in the alternative, Defendant regarded and/or perceived Plaintiff as having an impairment, as that phrase is defined and applied under the ADA, FEPA, CRPD, and/or RICRA, including Plaintiff's ADHD.

184. Accordingly, at all relevant times, Defendant regarded and/or perceived Plaintiff as being disabled and/or had a record of her impairment.

***Qualified Individual***

185. At all relevant times, Plaintiff was able to and in fact did perform her regular duties as a Campus Police Officer, which clearly establishes her ability to perform the "essential" tasks required of her job "with or without reasonable accommodation."

186. Accordingly, at all relevant times, Plaintiff was a qualified individual or otherwise qualified, as those terms are defined under the ADA, FEPA, CRPD, and/or RICRA.

***Adverse Employment Action***

187. Plaintiff began experiencing adverse employment action at the hands of Defendant almost immediately after she informed Defendant of her disability and her need for a reasonable accommodation in the form of intermittent FMLA leave and/or a work-schedule modification to allow her to arrive at work between one (1) and twenty (20) minutes late as described above.

188. Specifically, Defendant disciplined Plaintiff almost immediately following her request for and attempted use of said reasonable accommodation and ultimately terminated Plaintiff's employment for tardiness, the process basis for her requested accommodation.

***Failure to Provide Reasonable Accommodation/Engage in an Interactive Dialogue***

189. Defendant was aware that Plaintiff had a need for a reasonable accommodation due to her disability in the form of allowing her to take intermittent FMLA leave and/or a work-schedule modification when her disability caused her to arrive to work a few minutes late.

190. Defendant refused to provide Plaintiff with the medically documented reasonable accommodation she requested by, among other actions, repeatedly disciplining her for being tardy on days she requested the accommodation.

191. Defendant's failure or refusal to engage in a dialogue relative to the necessity and nature of any reasonable accommodation Plaintiff required, in and of itself, qualifies as prohibited disability discrimination.

***Disability Discrimination and Retaliation***

192. Pursuant to the ADA, it is "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed … any right granted or protected by [the ADA]." 42 U.S.C. § 12203(b).

193. Pursuant to the FEPA, it is unlawful "to discriminate in any manner against any individual because he or she has opposed any practice forbidden by this chapter . . ..." R.I. Gen. Laws § 28-5-7(5).

194. Defendant retaliated and discriminated against Plaintiff for requesting a reasonable accommodation as described above.

195. Defendant interfered with Plaintiff's rights under the ADA and FEPA as described above.

196. Defendant unlawfully intimidated or threatened Plaintiff in violation of the ADA and FEPA as described above.

197. Defendant unlawfully discriminated against Plaintiff for opposing Defendant's efforts to prevent her exercise of right under the ADA and FEPA.

## IX. General Employment Law Allegations

***Pretext and Discriminatory Animus***

198. Defendant's intent to discriminate against Plaintiff on account of her disability,

perceived impairment, recorded impairment, and/or protected conduct is further established, in part, by conduct evidencing that Defendant's reasons for disciplining and terminating her were pretextual and that unlawful discrimination and retaliation motivated its decision to discipline her and terminate her employment, including, but not limited to the following:

a) At least four (4) non-disabled DPS Campus Police Officers who were habitually late to work went unpunished by DPS for their lateness.

b) Plaintiff had previously been a few minutes tardy throughout her employment with Defendant but was never seriously disciplined for such tardiness until ***after*** Defendant became aware of Plaintiff's disability and ***after*** Plaintiff requested a reasonable accommodation.

c) Defendant has a history of interfering with or denying other employees' use of FMLA leave, even after intermittent leave had been approved; this history included multiple employees in Plaintiff's department.

d) Without engaging in a dialogue, Defendant unilaterally and materially altered Plaintiff's accommodation by requiring Plaintiff to call into work 30 minutes prior to her shift and before she left her home in order to use intermittent FMLA time, knowing well that Plaintiff's disability would prevent her from complying with this new requirement.

e) The various reasons DPS provided for the adverse actions it took against Plaintiff were either trivial, contrived, and/or blatantly false.

f) It is implausible that DPS would terminate Plaintiff, a longstanding, experienced, and reliable employee who had worked for DPS over 30 years, simply because she was a few minutes late for work on occasion, particularly in light of the fact

that Plaintiff's brief and insignificant tardiness never caused an interruption to DPS's operations or to Plaintiff's ability to successfully perform her job duties.

g) DPS refused and/or failed to follow the Contract and its own policies when taking adverse actions against Plaintiff.

h) Defendant failed and/or refused to substantiate its claims regarding Plaintiff's alleged tardiness with adequate documentation corroborating the same.

199. The temporal proximity of adverse employment action against Plaintiff in relation to her requests for FMLA/RIPFMLA intermittent leave and reasonable accommodation further supports an inference of discriminatory intent.

***Motivation and Harm***

200. Defendant's wrongful and/or unlawful acts and/or omissions, including, but not limited to those described herein, violated the FMLA, RIPFMLA, ADA, FEPA, CRPD, and/or RICRA and were motivated by malice or ill will toward Plaintiff, and Defendant otherwise acted in bad faith and/or with reckless indifference to the statutorily protected rights of Plaintiff.

201. As a proximate result of Defendant's wrongful and/or unlawful discriminatory acts and/or omissions, including, but not limited to those described herein, Plaintiff suffered, is now suffering, and will continue to suffer emotional and economic injury, including, but not limited to, pecuniary losses, loss of income, loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, damage to her professional and personal reputation, and has incurred and will continue to incur expenses for legal services, and other great harm.

## X. <u>Causes of Action</u>

202. Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 201 of this Complaint in each of the counts below with the same force and

effect as if set forth therein.

**<u>Count One</u>**
**Family and Medical Leave Act**
**29 U.S.C. § 2601, *et seq*.**
***Interference, Retaliation, and Discrimination***

203. Defendant, by its acts and/or omissions, including, but not limited to those described herein, violated Plaintiff's rights under the FMLA, and thereby deprived Plaintiff of rights secured under the FMLA, causing Plaintiff to suffer damages as aforesaid.

**<u>Count Two</u>**
**Rhode Island Parental and Family Medical Leave Act**
**R.I. Gen. Laws § 28-48-1, *et seq*.**
***Interference, Retaliation, and Discrimination***

204. Defendant, by its acts and/or omissions, including, but not limited to those described herein, violated Plaintiff's rights under the RIPFMLA and thereby deprived Plaintiff of rights secured under the RIPFMLA, causing Plaintiff to suffer damages as aforesaid.

**<u>Count Three</u>**
**Americans with Disabilities Act**
**42 U.S.C. § 12101, *et seq.***
***Discrimination, Failure to Accommodate, and Retaliation/Interference***

205. Defendant, by its acts and/or omissions, including, but not limited to those described herein, engaged in unlawful discrimination on the basis of Plaintiff's disability in violation of the ADA and thereby deprived Plaintiff of rights secured under the ADA, causing Plaintiff to suffer damages as aforesaid..

**<u>Count Four</u>**
**Rhode Island Fair Employment Practices Act**
**R.I. Gen. Laws § 28-5-1, *et seq.***
***Discrimination, Failure to Accommodate, and Retaliation/Interference***

206. Defendant, by its acts and/or omissions, including, but not limited to those described herein, engaged in unlawful discrimination on the basis of Plaintiff's disability in

violation of the FEPA and thereby deprived Plaintiff of rights secured under the FEPA, causing Plaintiff to suffer damages as aforesaid..

**Count Five**
**Civil Rights of People with Disabilities**
**R.I. Gen. Laws § 42-87-1, *et seq.***
***Discrimination, Failure to Accommodate, and Retaliation/Interference***

207. Defendant, by its acts and/or omissions, including, but not limited to those described herein, engaged in unlawful discrimination on the basis of Plaintiff's disability in violation of the CRPD and thereby deprived Plaintiff of rights secured under the CRPD, causing Plaintiff to suffer damages as aforesaid.

**Count Six**
**Rhode Island Civil Rights Act of 1990**
**R.I. Gen. Laws § 42-112-1, *et seq*.**
***Discrimination, Failure to Accommodate, and Retaliation/Interference***

208. Defendant, by its acts and/or omissions, including, but not limited to those described herein, engaged in unlawful discrimination on the basis of Plaintiff's disability in violation of the RICRA, and thereby wrongfully interfered with Plaintiff's contract of employment and Plaintiff's right to the full and equal benefit of all laws in violation of the RICRA, and thereby deprived Plaintiff of rights secured under the RICRA, causing Plaintiff to suffer damages as aforesaid.

## XI. Prayers for Relief

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court grant the following relief:

1. A declaratory judgment declaring the acts and/or omissions of Defendant, including, but not limited to those complained of herein, to be in violation of the FMLA, RIPFMLA, ADA, FEPA, CRPD, and/or RICRA.

2. An injunction or other equitable relief directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated.

3. An injunction or other equitable relief, including, but not limited to, an award of back pay, front pay or reinstatement, other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendant's unlawful conduct.

4. An award of compensatory damages.

5. An award of punitive damages.

6. An award of liquidated damages.

7. An award of prejudgment interest, reasonable attorneys' fees, and costs.

8. Such other and further relief as this Court deems just and proper.

## XII. Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## XIII. Designation of Trial Counsel

Plaintiff hereby designates Richard A. Sinapi, Esquire, as trial counsel.

Plaintiff,
By her attorneys,
**SINAPI LAW ASSOCIATES, LTD.**

**Dated: October 14, 2025**

/s/ **Chloe A. Davis, Esq.**

**Chloe A. Davis, Esq. (#9334)**
**Richard A. Sinapi, Esq. (#2977)**
2374 Post Road, Suite 201
Warwick, RI 02886
Phone: (401) 739-9690; FAX: (401) 739-9040
Email: cad@sinapilaw.com
ras@sinapilaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on **October 14, 2025**, a true copy of the within was filed electronically via the Court's CM/ECF System. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and the filing is available for viewing and downloading from the Court's CM/ECF System.

**/s/ Chloe A. Davis, Esq**.